**Slip Op.** 05-3

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                                    :
LUOYANG BEARING CORP. (GROUP),                      :
ZHEJIANG MACHINERY IMPORT & EXPORT                  :
CORP., and CHINA NATIONAL MACHINERY                 :
IMPORT & EXPORT CORPORATION,                        :
                                                    :
                    Plaintiffs,                     :
                                                    :
                    and                             :
                                                    :
WAFANGDIAN BEARING COMPANY, LTD.,                    :
                                                    :
                    Plaintiff and                   :
                    Defendant-Intervenor,           :        Consol. Court No.
                                                    :        01-00036
                    v.                              :
                                                    :
UNITED STATES,                                      :
                                                    :
                    Defendant,                      :
                                                    :
                    and                             :
                                                    :
THE TIMKEN COMPANY,                                 :
                                                    :
                    Defendant-Intervenor            :
                    and Plaintiff.                  :
_____:

Commerce's Remand Results are affirmed.  Case dismissed.

     Hume & Associates PC (Robert T. Hume) for Luoyang Bearing
Corp. (Group) and Zhejiang Machinery Import & Export Corp.,
plaintiffs and Wafangdian Bearing Company, Ltd., plaintiff and
defendant-intervenor.

     Venable LLP (Lindsay B. Meyer and Kristin K. Woody) for China
National Machinery Import & Export Corporation, plaintiff.

     Peter D. Keisler, Assistant Attorney General; David M. Cohen,
Director, and Jeanne E. Davidson, Deputy Director, Commercial
Litigation Branch, Civil Division, United States Department of
Justice (Claudia Burke); of counsel: Amanda L. Blaurock, Attorney,
Office of the Chief Counsel for Import Administration, United

States Department of Commerce, for the United States, defendant.

   Stewart and Stewart (Terence P. Stewart and Wesley K. Caine) for The Timken Company, defendant-intervenor and plaintiff.

**OPINION**

**I.   Standard of Review**

The Court will uphold Commerce's redetermination pursuant to the Court's remand unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).

**II.  Background**

In Luoyang Bearing Corp. (Group) v. United States, 2004 Ct. Intl. Trade LEXIS 51 (May 18, 2004) the Court remanded the case to the United States Department of Commerce, International Trade

Administration ("Commerce") with instructions to: (1) explain why the surrogate values it chose for wooden cases used to ship tapered rollers bearings ("TRBs") to the United States and the steel used to produce rollers by Wafangdian Bearing Company, Ltd. ("Wafangdian") constitutes "the best available information;" (2) address the aberrational record data noted by Luoyang Bearing Corp. (Group) ("Luoyang"), Wafangdian, and Zhejiang Machinery Import & Export Corp. ("ZMC") (collectively, "Luoyang et al."); and (3) conduct a separate rates analysis for Premier Bearing & Equipment Ltd. ("Premier") and apply the People's Republic of China ("PRC") country-wide rate to all of Premier's United States sales unless Premier is found independent of government control.  See Luoyang, 2004 Ct. Intl. Trade LEXIS 51.

Commerce filed its Final Results of Redetermination Pursuant to Remand ("Remand Results") on September 30, 2004.  Luoyang et al. and The Timken Company ("Timken") filed their comments to Commerce's Remand Results on October 27, 2004, and October 20, 2004, respectively.[1]  Commerce's response to these comments was filed with this Court on December 6, 2004.  Timken filed rebuttal comments to Luoyang et al.'s comments on November 12, 2004.

---

[1]     China National Machinery Import & Export Corporation did not submit comments to Commerce's Remand Results.

**III. Commerce Reasonably Explained its Choice of Surrogate Values**

Commerce explains that when calculating surrogate values it generally relies on data from its primary surrogate country, which in the case at bar is India. See Remand Results at 7. In determining the value of steel used to produce TRBs, Commerce calculates a weighted average of the import prices into India from only market economy countries with imports more than seven metric tons. See id. at 7-8. Commerce excludes "imports from a country when the total amount imported from that country is small and the per-unit value of those imports is substantially different from the per-unit values of larger-quantity imports of that product from other countries . . . ." Id. at 8. Commerce excluded from the Indian import data all imports from the PRC and Russia because each was a non-market economy country ("NME"). See id. at 10. Commerce also excluded imports from Australia, Sweden, and the United Kingdom because each country's total imports during the reporting period was less than seven metric tons, Commerce's benchmark for inclusion in the weighted average calculation. See id.

Upon reexamination, Commerce determined that "imports into India from Austria and Germany were made in small quantities and at per-unit values which differed substantially from the per-unit values of the larger-quantity imports . . . ." Id. at 11. Accordingly, Commerce excluded all imports into India from Austria

and Germany.  See id.  Although Commerce found imports from France
and Italy were also low (in comparison to imports from Brazil and
Japan which accounted for the majority of the Indian imports),
Commerce also found that the unit values from these countries were
in line with the unit values of countries with larger quantities of
exports to India.  See id.  Furthermore, Commerce included imports
from France and Italy, even though some months evidenced extremely
small quantities of imports, because overall imports from the two
countries equaled 11 and 9 metric tons, respectively.  See id.
Commerce explains that its practice is not "to exclude certain
months of a country's data from [its] surrogate value calculation
based solely on the fact that the volume of imports from that
country are small in a particular month."  Id. at 9.  Commerce used
the Indian import data to calculate the surrogate value for the
steel used to produce rollers "because this data was the most
contemporaneous data on the record, yielded a value that was
reliable when compared to the [United States] benchmark value, and
was from [Commerce's] primary surrogate country, India . . . ."
Id. at 10.

With respect to values for wooden cases, Commerce examined the
Indian import data from a previous review, as requested by
Wafangdian, but rejected the use of such data.  See Final Results
at 12.  Commerce used Indian imports under the Harmonize Schedule

category 4415.1000 (Cases Boxes Crates Drums and Similar Packing Cable-Drums of Wood) for the period April 1998 to August 1998, exclusive of imports from the PRC. See id. at 12-13. Commerce found that imports from the United Kingdom were small, only 1.17 percent of all imports, while imports from other countries each accounted for 7 percent or more of imports. See id. at 13. Accordingly, Commerce compared the unit value of United Kingdom imports with the other countries' larger-quantity import values. See id. Commerce found that the per-unit value of exports from the United Kingdom to India fell between the per-unit values of exports from Germany and the United States. See id. Commerce, therefore, determined that the per-unit value for exports from the United Kingdom are not aberrational but rather are comparable to the values of other countries that exported larger quantities to India. See id. at 14.

In its treatment of import data from Spain, Commerce explains that it only excludes "values when the total amount imported from that country is small and the per-unit value of those imports is substantially different from the per-unit values of larger-quantity imports of that product from other countries that exported to the surrogate country." Id. Here, Luoyang et al. did not argue, and Commerce did not find, that shipments from Spain to India were in small quantities. See id. Consequently, Commerce did not exclude

imports from Spain in its calculation of surrogate values for wooden cases.  See id.

Commerce reviewed the record and revised the surrogate value for roller steel to $772.25 per metric ton.  See Remand Results at 14.  Commerce, however, found that no changes were necessary for the surrogate value of wooden cases.  The Court finds that Commerce complied with the Court's opinion and order in Luoyang, 2004 Ct. Intl. Trade LEXIS 51.  Commerce reasonably explained why the Indian import values were the "best available information" to calculate the surrogate value for steel used to produce rollers.  Commerce also reasonably included export values from the United Kingdom and Spain in its calculation of the surrogate value for wooden cases.  Moreover, Commerce's determination is supported by substantial record evidence.

**IV.  Commerce Properly Did Not Revoke the Antidumping Order For ZMC**

  **A.    Background**

In reviewing the record on remand, Commerce discovered a clerical error in calculating the antidumping margin for ZMC.  See Remand Results at 23.  Commerce had erroneously assigned the surrogate value calculated for steel used to manufacture cups and cone steel input to the roller and cage steel inputs.  See id. Commerce, therefore, recalculated ZMC's antidumping margin, which

had been calculated at 7.37 percent, and assigned a 0.00 percent margin to ZMC.  See id.  During the administrative review, ZMC requested Commerce to revoke the antidumping margin and Commerce had preliminarily found that ZMC qualified for revocation.  See id. In its final results, however, Commerce did not revoke the order because ZMC had been assigned a 7.37 percent antidumping margin. See id.  Upon correcting ZMC's antidumping margin, Commerce determined in the Remand Results that the antidumping order should not be revoked because there was evidence that ZMC had dumped during a subsequent period of review.  See id.

## B.   Analysis

Commerce properly determined to reject ZMC's request to revoke the antidumping duty order against it.  The pertinent regulations set out three criteria Commerce is to consider in determining whether to revoke in part an antidumping duty order.[2]  See 19

---

[2]     The regulations state that in making its determination to revoke an antidumping duty order in part, Commerce is to consider:

(A) Whether one or more exporters or producers covered by the order have sold the merchandise at not less than normal value for a period of at least three consecutive years;

(B) Whether, for any exporter or producers that [Commerce] previously has determined to have sold the subject merchandise at less than normal value, the exporter or producer agrees in writing to its immediate reinstatement in the order . . . if [Commerce] concludes that the exporter or producer, subsequent to the revocation, sold the subject merchandise at less than normal value; and

C.F.R. § 351.222(B)(2)(i) (2004). ZMC argues that it has fulfilled all three of the regulatory criteria. See Comments of ZMC Commerce's Final Redetermination Results Pursuant Remand ("ZMC's Comments") at 4-9. ZMC asserts that the 0.00 percent antidumping margin is at least the third consecutive year that it has been found not to sell the subject merchandise for less than fair value. See id. at 5. Moreover, ZMC has agreed in writing to the immediate reinstatement of the antidumping duty order if Commerce finds that it has sold the subject merchandise at less than normal value. See id. ZMC argues that Commerce's reasons for deciding to not revoke the order is faulty; "[b]ut for the margin in [the subsequent review], Commerce would have revoked the order with respect to ZMC." See id. at 4.

While ZMC has fulfilled two of the three regulatory criteria set forth in 19 C.F.R. § 351.222(B)(2)(i)(A) & (B), the Court finds that ZMC's application for revocation of the antidumping duty order fails under the third criteria, 19 C.F.R. § 351.222(B)(2)(i)(C). Here, Commerce properly determined that "the discipline of the order continues to be necessary to offset dumping by ZMC." Remand Results at 31. Commerce based its decision on evidence that ZMC

---

(C) Whether the continued application of the antidumping duty order is otherwise necessary to offset dumping.

19 C.F.R. § 351.222(B)(2)(i).

sold subject merchandise at less than normal value in a subsequent administrative review.  See id. (citing Final Results of 2000-2001 Administrative Review, Partial Rescission of Review, and Determination to Revoke Order, in Part for Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("2001 Final Results"), 67 Fed. Reg. 68,990 (November 14, 2002).  Based on this evidence, Commerce reasonably determined that it would not revoke ZMC's antidumping duty order because it remains necessary to offset dumping by ZMC.[3]

ZMC asserts that if Commerce had not miscalculated ZMC's dumping margin for the final results, then Commerce would have revoked the antidumping duty order against it.  See ZMC's Comments at 4.  Commerce's only basis to reject ZMC's application arose after the conclusion of the subsequent administrative review.  ZMC argues that the Court should apply nunc pro tunc principles and order Commerce to revoke the antidumping duty order against it.

_____

[3]    ZMC argues that Commerce's determination in the 2001 Final Results is erroneous because Commerce made a ministerial error in the calculation of ZMC's dumping margin.  See ZMC's Comments at 6-9.  Accordingly, ZMC requests the Court to direct Commerce to revisit and correct this alleged calculation error. See id.  The Court's jurisdiction, however, is limited to Commerce's factual determination and remand determination in the case at bar.  The Court lacks jurisdiction to consider the propriety of Commerce's determination in an administrative review subject of a separate civil action.  The 2001 Final Results, which ZMC calls into question, involve a record that is not before the Court in the context of this action.

See id. at 5-6.  The Court finds ZMC's argument to be without merit.  While ZMC should have qualified for revocation for the final results of this administrative review, Commerce may not ignore the evidence of continued dumping by ZMC, even if such evidence is uncovered in a subsequent administrative review. "[A]ntidumping laws are not punitive in nature, but are designed to remedy the inequities caused by unfair trade practices."  Allied Tube & Conduit Corp. v. United States, 24 CIT 1357, 1370, 127 F. Supp. 2d 207, 218 (2000); see NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (stating that "the antidumping laws are remedial not punitive" (citing Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103-04 (Fed. Cir. 1990))).  If Commerce does not consider the evidence that ZMC dumped during a subsequent period of review, then the remedial purpose of antidumping duty laws are undermined.  Accordingly, the Court sustains Commerce's determination to maintain the antidumping duty order against ZMC.

**V.   Commerce Properly Applied the Separate Rates Test**

   **A.   Contentions of the Parties**

      **1.   Timken's Contentions**

Timken contends that Commerce failed to comply with the Court's remand because Commerce's separate rates analysis failed to

consider Premier in combination with its Chinese suppliers. See
Comments Timken Commerce's Redetermination Pursuant Remand
("Timken's Comments") at 2-10. Timken argues that Commerce
"avoided the Court's recognition that Premier needed to show
independence in conjunction - i.e., in combination - with the
company's various NME suppliers . . . ." Id. at 3 (emphasis in
original). Timken maintains that Commerce's Remand Results are in
error because they are "based on a narrow and incorrect reading of
this Court's remand decision, and address[] an issue not in
dispute, viz., Premier's own technical independence when viewed in
abstract isolation." Id. at 4.

Timken also argues that the Remand Results contradict other
agency positions. Timken notes that Commerce's regulations
regarding the revocation of antidumping duty orders directs
Commerce to focus "on combinations of particular exporters and
their producers when trading companies (resellers) are involved."
Id. at 5 (emphasis in original). The regulation, according to
Timken, recognizes that data from the producer of the subject
merchandise is important for determining whether a reseller or
exporter qualifies for revocation. See id. Timken argues that
Commerce's conflicting positions do not deserve deference from the
Court. Timken also notes that Commerce has proposed a revision to
its practice when NME producers sell subject merchandise through

exporters located in a market economy. See id. at 7. Timken maintains that the proposed revision evidences agency inconsistencies toward the treatment of resellers. See id. at 9. Therefore, Timken asks the Court to direct Commerce to conduct a separate rates analysis for Premier in combination with each of its suppliers and apply the PRC rate to all United States sales of subject merchandise unless the Chinese supplier and Premier have established their independence from the state. See id.

### 2. Commerce's Contentions

Commerce responds that it properly implemented the Court's opinion and order and applied the separate rates test to Premier. See Def.'s Resp. Pl.'s Def.-Intervenor's Comments Upon Commerce's Final Results ("Commerce's Comments") 9-12. Commerce analyzed whether Premier had established the absence of government control in law and in fact. See id. at 10. Commerce argues that "the Court in no way suggested or implied that the analysis should be applied to any other entity." Id. at 11.

Based on Premier's questionnaire responses, Commerce found that Premier successfully demonstrated a lack of de jure government control. See id. at 10. Although Premier could not provide legislation or other governmental measures demonstrating decentralized control of Premier's export activities, Premier provided a copy of its business registration certificate, which

certified that Premier was operating legally in Hong Kong.  See
Final Results at 20.  In addition, Premier's responses indicated
that the subject merchandise was not on any government list of
export provisions or export licensing and that there were no export
quotas.  See id. at 20-21.  Moreover, Commerce found that "the PRC
exercised no de facto government control over Premier."  Commerce's
Comments at 10.  Premier demonstrated that: (1) it established its
own export prices through direct negotiations with its customers;
(2) its pricing was not coordinated with other exporters or the
Hong Kong Chamber of Commerce; (3) the selection process for its
directors was not controlled by the government; (4) it had sole
control over its bank accounts; and (5) the activities of its
general manager were not subject to any level of government
approval.  See id. at 10-11.  Accordingly, Commerce found that
Premier was not subject to  government control and therefore should
be assessed a separate rate from the PRC rate.[4]

### B.  Analysis

The Court instructed Commerce to conduct the separate rates
analysis for Premier and apply the PRC rate to all of Premier's
United States sales unless Commerce found Premier to be free of

---

[4]     Commerce issued a notice inviting comments upon a
possible change to its NME separate rates analysis.  See Commerce's
Comments at 10.  Commerce maintains that such notice does not
constitute a change in its policy.  See id. at 12.

state control.  See Luoyang, 2004 Ct. Intl. Trade LEXIS at *84-85.

On remand, Commerce found that Premier has established that it is

autonomous from government control.  See Final Results at 20-23.

Commerce determined that Premier is the company that set the price

at which the subject merchandise was sold in the United States.

See id. at 24.  Accordingly, Commerce found that Premier warranted

a company-specific dumping margin and not the PRC rate to all of

Premier's sales to the United States.   The Court finds that

Commerce fully complied with its instruction to conduct a separate

rates analysis and that Commerce's determination is supported by

substantial evidence.

    As the Court has stated before, "the essence of a separate

rates analysis is to determine whether the exporter is an

autonomous market participant, or whether instead it is so closely

tied to the communist government as to be shielded from the

vagaries of the free market."  See Fujian Mach. & Equip. Imp. &

Export Corp. v. United States, 25 CIT 1150, 1174, 178 F. Supp. 2d

1305, 1331 (2001) (emphasis added).  Contrary to Timken's argument

that Commerce's separate rates analysis must also consider

Premier's NME suppliers, a separate rate analysis is used to

determine whether the exporter, not the producer of the subject

merchandise, is an autonomous market participant.  See id.; see

also Final Determination of Sales at Less Than Fair Value for

Sparklers From the People's Republic of China, 56 Fed. Reg. 20,588
(May 6, 1991). The separate rates analysis focuses on the
exporter's activities and the exporter's ability to set the United
States price for its sales of the subject merchandise.
Accordingly, an exporter may qualify for a separate antidumping
duty rate by demonstrating both de jure and de facto independence
from the central government. See Sigma Corp. v. United States, 117
F.3d 1401, 1405 (Fed. Cir. 1997). To show a lack of de jure
control, an exporter may point to legislation or other governmental
measures that demonstrate a lack of centralized control. See id.
The absence of de facto control may be established with evidence
that the exporter: (1) sets its prices and negotiates its contracts
independently of the government and other exporters; (2) controls
the proceeds of its sales; and (3) makes its own personnel
decision, such as the selection of management. See id.

Here, Commerce properly found that Premier established that
there was an absence of both de jure and de facto government
control. Premier's business registration certificate shows that it
was operating legally in Hong Kong. See Remand Results at 20-21.
In addition, the subject merchandise was not on any government list
of export provisions or export licensing and there was no
indication of export quotas. See id. Premier also successfully
demonstrated that: (1) it negotiated directly with its customers to

establish its export prices; (2) its pricing was not coordinated with either other exporters or the Hong Kong Chamber of Commerce; (3) the government did not control the selection process for its directors; (4) it solely controlled its accounts; and (5) its general manager's activities were not subject to any level of government approval.  See id. at 21-22.  The Court finds that Commerce's determination to apply a separate antidumping duty rate to Premier is supported by substantial evidence.

## VI.   Commerce's Use of Other Producers' Factors Data to Calculate Premier's Normal Value

In Luoyang, 2004 Ct. Intl. Trade LEXIS 51, the Court stated that it would "not address the issue of whether Commerce should have applied the Premier 'facts available' rate of 25.56 percent to all reported Premier sales until it receives the remand results." Id. at *89.  The Court finds that Commerce's determination to apply partial facts available is supported by substantial evidence and in accordance with law.[5]  Timken argues that Commerce improperly determined that Premier acted to the best of its ability to obtain factors of production ("FOP") information and that Commerce should have applied adverse facts available to all of Premier's sales. See id. at *85.  Premier provided Commerce with FOP information for

_____

[5]     The Court set forth a detailed account of the arguments of Timken and Commerce in Luoyang, 2004 Ct. Intl. Trade LEXIS 51, at *85-88.

some of its suppliers.  See Issues and Decision Mem.[6] at 34-36.  In

the instances in which it was unable to obtain such information,

Premier provided Commerce with documentation of its efforts to

obtain the information from its suppliers.  See id.  Commerce found

that this documentation demonstrated Premier's good faith efforts

to supply Commerce with the requested information.   The Court

agrees with Commerce and finds Commerce's refusal to apply adverse

facts available to all of Premier's sales reasonable and in

accordance with law.

Commerce took into consideration "the fact that Premier's

suppliers may be direct competitors of Premier and, therefore, may

be understandably reluctant to provide proprietary information to

Premier."  Id. at 34.  Timken points out that different conclusions

may be drawn as to why Premier failed to provide FOP information.

Inconsistent conclusions drawn from record evidence, however, does

not render Commerce's conclusions unsupported by substantial

evidence.  See Consolo, 383 U.S. at 620.  Here, Commerce properly

---

[6]    The full title of this document is Issues and Decision Memo for the 1998-99 Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China; Final Results, compiled as an appendix to the Amended Final Results of 1998-1999 Administrative Review and Determination To Revoke Order in Part on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Amended Final Results"), 66 Fed. Reg. 11,562 (Feb. 26, 2001).  The Court will refer to this document as Issues & Decision Mem. and match pagination to the printed documents from www.ia.ita.doc.gov/frn/summary/prc/01-777-1.txt.

inferred from record evidence that Premier acted to the best of its ability to supply Commerce with FOP information.[7]  The Court finds that Commerce properly applied adverse facts available only to those sales of models with no corresponding FOP data.[8]  Commerce's use of model-specific FOP data on the record of corresponding models was reasonable and in accordance with law.

---

[7]     Commerce inferred that: (1) Premier would not benefit from submitting incomplete FOP data; (2) Premier's competitors would be reluctant to provide proprietary information; and (3) Premier's high antidumping duty margins in previous reviews provided an incentive for Premier to cooperate during this review. See Issues and Decision Mem. at 34-35.

[8]     Timken argues that Commerce erred by using other producers' data in the record to calculate Premier's normal value. See Timken's Comments at 4.  Timken argues that Commerce has violated the statute, 19 U.S.C. § 1677b(c)(1) (1994), which "directs Commerce to determine the 'normal value' of particular goods by reference to the producer's FOPs, not those of other producers." Timken's Comments at 4.  Timken takes issue with the method used by Commerce to calculate a factor utilization rate for Premier in the instances in which no actual FOP data existed.  As long as Commerce's choice of methodology is reasonable and supported by substantial evidence, "courts are even less in the position to question an agency action . . . ." Maier, P.E. v. United States Envtl. Prot. Agency, 114 F.3d 1032, 1043 (10th Cir. 1997) (citing Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1221 (D.C. Cir. 1983)); See also Shandong Huarong Gen. Corp. v. United States, 25 CIT 834, 840, 159 F. Supp. 2d 714, 721 (2001) (stating that Commerce's methodology does not have to be "the only way  or even the best way to calculate surrogate values for factors of production as long as it was reasonable").  Here, Commerce's method of averaging the actual constructed value data by model for Premier's actual suppliers to the same models of producers that do not supply Premier is reasonable and supported by substantial evidence.

Therefore, upon review of the record, and the arguments presented by the parties on remand, the Court finds that the Remand Results are supported by substantial evidence on the record and in accordance with law.  Accordingly, it is hereby

**ORDERED** that the Remand Results are affirmed in all respects; and it is further

**ORDERED** that Commerce's determination to apply adverse facts available to only some of Premier's United States sales is reasonable and supported by substantial evidence; and it is further

**ORDERED** that since all other issues have been decided, this case is dismissed.

 /s/  Nicholas  Tsoucalas
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     January 21, 2005
           New York, New York