**Slip Op. 01-143**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |
|---|---|---|
| TA CHEN STAINLESS STEEL PIPE, Ltd., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 99-07-00446 |
| | : | |
| UNITED STATES, | : | **Public Version** |
| | : | |
| Defendant. | : | |
| | : | |

_____ :

[Antidumping Duty Remand Determination Sustained.]

Dated: December 13, 2001

Ablondi, Foster, Sobin & Davidow, P.C. (Joel Davidow, Peter Koenig, and Kristen Smith) for Plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mark L. Josephs), Cindy G. Buys, Office of the General Counsel, United States Department of Commerce, of counsel, for Defendant.

## OPINION

**RESTANI, Judge:** This antidumping duty matter is before the court following remand. See Ta Chen Stainless Steel Pipe, Inc. v. United States, Slip Op. 01-101, 2001 WL 915254 (Ct. Int'l Trade August 14, 2001) ("Ta Chen III"), familiarity with which is presumed. Plaintiff Ta Chen Stainless Steel Pipe, Ltd. ("Ta Chen") received an adverse Best Information Available (BIA) dumping margin because the Department of Commerce concluded that Ta Chen had

inexcusably failed to provide sales data for two entities related to it, San Shing Hardware Works, USA ("San Shing") and Sun Stainless Steel, Inc. ("Sun").

The first question to be addressed by Commerce on remand was whether San Shing and Sun are parties "by whom or for whose account merchandise is imported into the United States" under pre-URAA[1] 19 U.S.C. § 1677(13) (1988).[2] This is the first step in finding them to be related "exporters" from whom sales data was required.

Commerce determined that Sun and San Shing had replaced Ta Chen International ("TCI") as Ta Chen's welded pipe distributor in the United States and that the overwhelming

-------------------------------------------------

[1] Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994).

[2] 19 U.S.C. §1677(13) (1988) reads in pertinent part as follows:

(13) **Exporter**

For the purpose of determining United States price, the term "exporter" includes the person by whom or for whose account the merchandise is imported into the United States if--
>     (A) such person is the agent or principal of the exporter, manufacturer, or producer;
>     (B) such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;
>     (C) the exporter, manufacturer, or producer owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in any business conducted by such person; or
>     (D) any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer.

majority of Ta Chen's sales in the relevant reviews were imported for the account of San Shing and Sun.  Contrary to Ta Chen's argument, this is not a finding that § 1677(13) is satisfied by mere sales to customers.  Commerce's finding of virtual identity for this purpose between TCI and San Shing and Sun, and mutual dependence between San Shing and Sun on one hand and Ta Chen on the other is supported by the following evidence: (1) the purchase by San Shing and Sun of all of TCI's inventory, thereby effectively (even if not technically or legally) replacing TCI as the sole distributor of subject merchandise in the U.S. for at least part of the period of investigation (POI);[3] (2) the fact that 85% or 88% (depending on whether the appropriate measurement is weight or length) of Ta Chen's sales in the first review and over 80% in the second review were to customers sharing San Shing's and Sun's d/b/a names; (3) Ta Chen was the exclusive supplier for San Shing and Sun.

This analysis recognizes the business realities of this situation in which Ta Chen, which was making U.S. sales through related TCI, would have received Exporter Sales Price (ESP) treatment, but the reporting requirements were allegedly too burdensome.  See Certain Welded Stainless Steel Pipe from Taiwan, 64 Fed. Reg. 33,243 (1999).  Ta Chen restructured its distribution arrangements after the antidumping duty order was issued in an attempt to have all the Ta Chen sales treated as Purchase Price transactions, but did not in fact cease selling through a U.S. distributor, as described above.

---

[3]  The court is not persuaded that alleged TCI sales to [          ] of what may be another product or product from another time period have any bearing here.  Ta Chen has not pointed to sufficient evidence of relevant sales after the distribution restructuring to [          ] in these reviews to undermine Commerce's conclusion that TCI had been replaced as sole distributor of the subject merchandise.

This matter is distinguishable from <u>Certain Small Business Telephone Systems and Subassemblies Thereof from Korea</u>, 54 Fed. Reg. 53,141, 53,151 (1989) ("<u>Small Business Telephone</u>") as to the first step of § 1677(13) because, <u>inter alia</u>, the buyer from the U.S. distributor whom petitioner there sought to have recognized as the one for whose account the merchandise was imported did not not buy the entire sales inventory of the U.S. distributor and the U.S. distributor was recognized as the exporter for ESP purposes.

Defendant now recognizes that <u>Small Business Telephones</u> is not distinguishable for purposes of the second step of § 1677(13), which was also to be addressed on remand, and that Commerce's new policy which allows relatedness through control to be determined on other than ownership bases is different from that of <u>Small Business Telephones</u> and <u>Disposable Pocket Lighters from Thailand</u>, 60 Fed. Reg. 14,263, 14,267-68 (1995), in which control through equity ownership only determined relatedness.

Ta Chen misunderstands Commerce's duty of explanation of a policy change, as now admittedly occurred here. It is hornbook administrative law that an agency may change its policy, practice or legal interpretation, subject only to the constraint that it explain the reason for its change and that the new policy remains consistent with the governing statute. The reason for the change may simply be a reversal of the agency's position because it believes the new position to be more sound; no intervening event is required to justify the change. <u>Cf.</u> <u>Greater Boston Television Corp. v. F.C.C.</u>, 444 F.2d 841, 852 (D.C. Cir. 1970) (Leventhal, J.) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances."). To impose a requirement of changed circumstances, as Ta Chen would have the court do, would result in the ossification of the entire administrative state. In this regard, Ta

Chen also misapplies retroactivity analysis. An agency is free to adopt, employ, and alter rules made entirely through the course of adjudication, and therefore presumably through "investigations" such as these. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 219-25 (1988) (Scalia, J., concurring) (noting distinction between retroactivity in rule-making and adjudication contexts, and recognizing permissibility of retroactive application through adjudication). For example, such adjudicatory rule-making is the NLRB's virtually exclusive means of setting policies. See, e.g., Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 522 U.S. 359, 374 (1998). Identifying the Department's actions here as impermissible retroactivity would call into question every change in agency policy accomplished through adjudication or "investigation."

Here, Commerce cites to the Statement of Administration Action ("SAA") for the URAA as to the reason it changed its policy under prior law:

> "[C]ontrol" exists if one person is legally or operationally in a position to exercise restraint or direction over another person. The Administration believes that including control in the definition of "affiliated" will permit a more sophisticated analysis which better reflects the realities of the marketplace.
>
> The traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm "operationally in a position to exercise restraint or direction" over another even in the absence of an equity relationship. A company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchises or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other.

See SAA, accompanying H.R. Rep. No. 130-826 at 838, reprinted in 1994 U.S.C.C.A.N. 4040, 4174-75.

There is no conflict with pre-URAA statutory law. See 19 U.S.C. § 1677(13)(B), (C) (relatedness established by ownership or control of exporter or importer "directly or indirectly,

through stock ownership or control or otherwise" of the other); see also Ta Chen III, 2001 WL 915254 at *5. Any limitation of relatedness inquiries to equity ownership was of Commerce's own making and Commerce has justified its departure, even under prior law.

In the remand determination, Commerce cites in support of its finding of relatedness through control largely the same reasons which support its determination that San Shing and Sun qualified as parties for whose account merchandise is imported. In fact, the evidence supports both findings. In addition, Commerce noted that a stockholder and director of Ta Chen incorporated Sun, and that the President of Ta Chen and TCI owned the property at Sun's address. In its original pre-remand final determination, Commerce also relied on Ta Chen's control of check signing stamps, unfettered computer access, intermingling of personnel, preferential credit and pricing arrangements, general lack of distinguishment of financial interests between Ta Chen and Sun and San Shing and negotiations of Sun and San Shing's sales by Ta Chen. See 64 Fed. Reg. at 33,251, 33,256-59. These matters were discussed in detail in Ta Chen Stainless Steel Pipe, Inc. v. United States, Slip Op. 99-117, 1999 WL 1001194, *11 (Ct. Int'l Trade, Oct. 28, 1999) ("Ta Chen I"), and led the court there to conclude that Commerce's finding of relatedness was substantially supported.[4] The determination here leads to no different result. Commerce's determination of relatedness is adequately supported.

---

[4] Ta Chen I involved the third review period and was completed before the reviews for the earlier periods at issue here.

Next, the court must decide whether Commerce may resort to BIA.[5] The issue is whether Ta Chen had notice of the agency's request for sales data for Sun and San Shing. Ta Chen did have notice that the related party issue would pose a problem, as evidenced by the petitioners' submissions raising precisely this point. See, e.g., Questionnaire Response (May 18, 1994), at 2, 48, C.R. Doc. 1, Def.'s App., Tab 1, at 2, 4; Petitioner's Letter to Commerce (July 18, 1994), at 1, C.R. Doc. 2, Def's App., Tab 2, at 1. The Department's initial questionnaire also defines related parties more broadly than that which would fit Ta Chen's view of Commerce's previous "equity only" standard, see, e.g., Original Questionnaire (March 16, 1994), at 93, P.R. Doc. 7, Def.'s App., Tab 1, at 5, suggesting that Ta Chen was expected to provide information on parties with interlocking directorates as well as those related by equity. The Department asked questions about the involvement with Ta Chen of certain persons also involved with San Shing and Sun, revealing at least an initial interest in control by means beyond equity ownership. Ta Chen also continued throughout each review to deny any relatedness with Sun or San Shing, indicating its awareness of the continuing controversy over the issue.

In Ta Chen I, the court found that Ta Chen did not have adequate notice of the information sought pursuant to post-URAA law. Commerce had sent a supplemental questionnaire on December 24, 1996, stating that no decision had been made in any of the

---

[5] Whether sales to [          ] are correctly reported is of no moment. Respondents may not pick and choose which data to report. See, e.g., Rhone Poulene, Inc, v. United States, 899 F.2d 1185, 1190 (Fed Cir 1990). The failure to report San Shing and Sun sales was a substantial failure to comply with an information request. When such a substantial failure of compliance occurs Commerce need not apply partial BIA, but may provide a total substitute margin. See id. (affirming, under pre-URAA law, the use of the highest calculated margin from prior administrative reviews as BIA for respondent who provided deficient submissions).

reviews as to whether Ta Chen was related to Sun. Only two weeks later, Commerce issued its Preliminary Results for the third review, finding that Sun and San Shing were related to Ta Chen. The court noted that, given the time frame, Commerce should have known when it issued the deficiency letter required by the URAA that it might find the parties to be related and therefore should have sought more information in a direct manner. See Ta Chen I, 1999 WL 1001194, at *12. In contrast, in this case, Preliminary Results were not issued until May, 1997. The results in the third review placed Ta Chen on notice that sales from Sun and San Shing were considered by Commerce to be related party sales, at least under the new statute. See Gourmet Equipment Corp. v. United States, No. 99-05-00262, 2000 WL 977369, at *4 (Ct. Int'l Trade July 6, 2000) ("When Commerce is judging a party's ability to comply in the context of an administrative review, as opposed to an initial investigation, it is not inappropriate for Commerce to consider that party's past behavior. Past participation may be relevant to notice, knowledge and reliance issues."). While it is true that Commerce could have issued another supplemental questionnaire again requesting resale data, this time specifically for Sun and San Shing, and under URAA's 19 U.S.C. § 1677m(d) likely would have, this was not required under prior law. Certainly after the third review preliminary results, viewed in conjunction with the Department's initial questionnaire and continuing questions regarding relatedness with Sun and San Shing in the first and second review supplemental questionnaires, Ta Chen was aware of the potential importance of submitting resale data for Sun and San Shing.[6]

_____

[6] Although a submission after the third review preliminary results would technically be beyond the deadline, see 19 C.F.R. § 353.31(a)(ii) (1993), the fact that these reviews have been extended for years may have provided Ta Chen with a strong basis to argue that the normal time

(continued...)

The problem in this case is that Commerce was not clear about its change in policy under the prior law until the remand decision here. Thus, Ta Chen claims it was not informed by citation to the former statute or by other questionnaire language. Ta Chen, on the other hand, was banking on prevailing on its legal arguments about prior law. If Commerce actually asked for the data, Ta Chen cannot rely solely on its legal argument, but must provide the data and make the argument later. Even after the third review results, Ta Chen did not seek clarification from Commerce, attempt to file data, or make a case as to why it could not.[7]

Because of the informal arrangements creating control by Ta Chen of Sun and San Shing, and the way these reviews proceeded, Ta Chen should have interpreted the questionnaires to require Sun and San Shing data. The facts here are unique enough that no previous decisions of Commerce exempted Ta Chen from providing the data.

As to the exact margin chosen, there is no requirement under pre-URAA law that petition margins be corroborated. On the other hand, Defendant is incorrect that only judicially invalidated margins may not be used as BIA.[8] D&L Supply Co. v. United States, 113 F.3d 1220,

---

[6](...continued)
limit of 180 days after initiation should not preclude the Department from accepting the data. Furthermore, for the Department to have refused Ta Chen's request under these circumstances would seem to be an abuse of discretion, if the earlier filings were insufficient to give Ta Chen notice. Ta Chen did not attempt to submit the information timely in response to supplemental questionnaires and it did not seek to provide it after the third review gave it further notice. Ta Chen may be held responsible for these failures.

[7] In fact, Ta Chen does not seek to provide that information now. In the third review, Ta Chen claimed inability to provide the data, and the court rejected that explanation. See Ta Chen Stainless Steel Pipe, Inc. v. United States, Slip Op. 00-107, 2000 WL 1225799 (Ct. Int'l Trade Aug. 25, 2000) ("Ta Chen II").

[8] The court notes that in the remand determination Commerce did not restrict its analysis
(continued...)

1223-24 (Fed. Cir. 1997), is not so limited.  See Pulton Chain Co., Inc. v. United States, 17 CIT

1136 (1993) (BIA rate found irrelevant to facts of cases); see also National Steel Co. v. United

States, 18 CIT 1126, 1132-33 (1994).  Commerce may not use any thoroughly discredited

margins.

Here, there are few margins available.  Use of Ta Chen's own original margin of 3.27%

or later 0% margin may reward its failures.  The 31.9% petition margin used for BIA as to other

parties is the only other margin available under Commerce's procedures.  Although the previous

calculated and verified margins were lower, this does not mean that the 31.9% margin, which

was for the same product and was not particularly old, is invalid.[9]  Ta Chen points to testimony,

which Commerce did not credit, that the dumping problem was rectified.  Even if Commerce had

reason to credit it, the testimony is too general to be of much use.  There are insufficient facts

here to compel Commerce to devise a new methodology to calculate an entirely new margin

somewhere between 3.27% and 31.9%.  The court concludes from the record that Ta Chen was

---

[8](...continued)
in this manner.  This was an incorrect post hoc legal argument.

[9] Commerce does not rely on it, but the margin for the third, earlier completed review,
was 30.95%.  See Ta Chen II.

betting on its legal arguments prevailing and that it knew what information Commerce was

seeking.  The whole thrust of Ta Chen's conduct was to avoid giving Commerce data on sales

from its U.S. distributor.  It has never proffered that data and it must receive a BIA rate.

     The remand determination is affirmed.


_____
                 Jane A. Restani
                   Judge


Dated: New York, New York

     This 13th day of December, 2001.