SLIP OP. 04-117

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

———————————————————————
                                          :
SHANDONG HUARONG GENERAL GROUP            :
CORPORATION & LIAONING MACHINERY          :
IMPORT & EXPORT CORPORATION,              :
                                          :
            PLAINTIFFS,                    :
                                          :
      V.                                   :          COURT NO. 01-00858
                                          :          PUBLIC VERSION
UNITED STATES,                            :
                                          :
            DEFENDANT.                     :
———————————————————————:

[United States Department of Commerce's final results of redetermination affirmed in part, remanded in part to Commerce a second time]


                                                Dated: September 13, 2004


      *Hume & Associates, PC* (*Robert T. Hume*), for Plaintiffs.

      *Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Civil Division, Commercial Litigation Branch; *Jeanne E. Davidson*, Deputy Director, International Trade Section, Civil Division, Commercial Litigation Branch (*Paul D. Kovac*); *Barbara J. Tsai*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.


                              OPINION AND ORDER

EATON, *Judge*: This matter is before the court following remand to the United States

Department of Commerce ("Commerce"). In *Shandong Huarong General Group Corp. v.*

*United States*, 27 CIT __, slip op. 03-135 (Oct. 22, 2003) ("*Huarong I*"), this court remanded

Commerce's determination in the ninth administrative review of heavy forged hand tools from

the People's Republic of China ("P.R.C."), covering the period of review February 1, 1999,

through January 31, 2000. *See* Heavy Forged Hand Tools From the P.R.C., 66 Fed. Reg. 48,026

(ITA Sept. 17, 2001) (final det.) ("Final Results"). Plaintiffs Shandong Huarong General Group

Corporation ("Huarong") and Liaoning Machinery Import and Export Corporation ("LMC")

(collectively the "Companies") had challenged that determination with respect to Commerce's

decision to apply the P.R.C.-wide antidumping duty margin to their subject merchandise. The

court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. §

1516a(a)(2)(B)(iii) (2000). For the reasons set forth below, this matter is affirmed in part, and

remanded in part to Commerce with instructions to conduct further proceedings in conformity

with this opinion.


BACKGROUND

The relevant facts and procedural history in this case are set forth in *Huarong I.* A brief

summary of these is included here. On February 14, 2000, Commerce published a notice of

opportunity to request administrative reviews of the antidumping duty order covering heavy

forged hand tools from the P.R.C. *See* Antidumping or Countervailing Duty Order, Finding, or

Suspended Investigation, 65 Fed. Reg. 7348, 7349 (ITA Feb. 14, 2000) (opportunity request

admin. rev.). In response, several P.R.C. entities—including the Companies—requested

administrative reviews. *See* Heavy Forged Hand Tools, Finished or Unfinished, With or Without

Handles, From the P.R.C., 65 Fed. Reg. 66,691, 66,692 (ITA Nov. 7, 2000) (prelim. results and

prelim. partial rescission of antidumping duty admin. revs.) ("Preliminary Results"). Commerce

then commenced its investigation and distributed standard nonmarket economy ("NME")

country[1] antidumping questionnaires.

Based on information provided by the Companies in their original and supplemental

questionnaire responses, Commerce determined that they were each preliminarily entitled to

company-specific antidumping duty margins separate from the P.R.C.-wide antidumping duty

margin. *See* Prelim. Results, 65 Fed. Reg. at 66,693. Commerce calculated Huarong's

preliminary company-specific antidumping duty rate for bars/wedges to be 0.44%, and calculated

LMC's preliminary company-specific antidumping duty rate for bars/wedges to be 0.01%. *See*

*id.* at 66,696. The P.R.C.-wide antidumping duty rate for bars/wedges was preliminarily

calculated to be 139.31%. *Id.*

Commerce then notified the Companies that it would conduct verification of their

submitted sales and factors of production information. Commerce conducted verification of

LMC's questionnaire responses from April 23 through April 26, 2001. *See* Verification in

Dalian, Liaoning, the P.R.C, of the Questionnaire Resps. of LMC in the Antidumping Duty

Admin. Rev. of Heavy Forged Hand Tools from the P.R.C., Conf. R. Doc. 73 ("LMC

---

[1]     A "nonmarket economy" country is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority." 19 U.S.C. § 1677(18)(C)(i).

Verification Report"). In its verification report, Commerce noted that Company A[2], not

Company B,[3] was actually the seller of an "overwhelming majority" of the bars and wedges, and

that Company B's role was largely limited to processing shipping documents and payment

receipts. *See* LMC Verification Report at 5. In other words, it was only at verification, and not

before, that Commerce learned the actual nature of these transactions.

Commerce then conducted verification of Huarong's questionnaire responses from May 2

through May 9, 2001. *See* Verification in Dongping Town, Shandong Province, the P.R.C., of

the Questionnaire Resps. of Shandong Huarong Gen. Group Corp. in the Antidumping Admin.

Rev. of Heavy Forged Hand Tools from the P.R.C., Conf. R. Doc. 74 ("Huarong Verification

Report"). Again, as with LMC, Commerce made certain "significant findings," including that

"[t]he overwhelming majority of sales activities for subject merchandise sales reported by

[Company B] were actually performed by [Company A]." *Id.* at 1. Indeed, Commerce

determined that the sales claimed by Company B were actually Company A's. *See* Application

of Adverse Facts Available to Shandong Huarong General Group Corp., Conf. R. Doc. 84 at 3.

After review and analysis of the questionnaire responses and the information gathered at

verification, Commerce determined that the use of facts available and adverse facts available was

warranted as the Companies did not cooperate by acting to the best of their ability to comply with

---

[2]        As this opinion was initially issued in confidential form, the court referred to
Huarong as Company A for ease of reading while maintaining confidentiality.

[3]        As this opinion was initially issued in confidential form, the court referred to
LMC as Company B for ease of reading while maintaining confidentiality.

Commerce's requests for information. *See* Final Results, 66 Fed. Reg. at 48,028. As a result of

these findings, the Companies' subject merchandise was assigned the final P.R.C.-wide

antidumping duty rate of 47.88%. *See id*. at 48,030 n.1 ("Based on the results of this review the

following companies are no longer eligible for separate rates . . . Huarong, and LMC."). The

Companies then commenced an action for judgment upon the agency record pursuant to USCIT

R. 56.2, arguing that Commerce's decision to apply the P.R.C.-wide antidumping duty margin to

their subject merchandise was not supported by substantial evidence or otherwise in accordance

with law. The court remanded, instructing Commerce to reevaluate the evidence submitted by

the Companies with respect to their entitlement to separate rates, and "revisit . . . its

determination that the Companies were to receive the PRC-wide antidumping duty margin."

*Huarong I*, slip op. 03-135 at 45.


## STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record or otherwise not in accordance with law . . . ."

19 U.S.C. § 1516a(b)(1)(B)(i); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d

1369, 1374 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (2000)). "Substantial

evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197,

229 (1938)). The existence of substantial evidence is determined "by considering the record as a

whole, including evidence that supports as well as evidence that 'fairly detracts from the

substantiality of the evidence.'" *Id.* (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556,

1562 (Fed. Cir. 1984)). Furthermore, "[a]s long as the agency's methodology and procedures are

reasonable means of effectuating the statutory purpose, and there is substantial evidence in the

record supporting the agency's conclusions, the court will not impose its own views as to the

sufficiency of the agency's investigation or question the agency's methodology." *Ceramica*

*Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd*

810 F.2d 1137 (Fed. Cir. 1987) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,

467 U.S. 837, 843 (1984); *Abbott v. Donovan*, 6 CIT 92, 97, 570 F. Supp. 41, 47 (1983)).

DISCUSSION

I.      Assignment of Separate Rates

In *Huarong I*, the court reviewed Commerce's decision to reject the Companies' separate

rates evidence and, thus, assign them the P.R.C.-wide antidumping duty rate based on the

presumption of state control. Commerce's decision rested on two bases—facts available, and

resort to adverse facts available. Use of facts available is warranted where Commerce finds that

a respondent has, *inter alia*, withheld or failed to provide the requested information. *See* 19

U.S.C. § 1677e(a)[4]; *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir.

---

[4]      This statute provides:

If—
(1) necessary information is not available on the record, or

(2) an interested party or any other person—

(A) withholds information that has
been requested by the administering
authority or the Commission under

(continued...)

2003) ("The focus of subsection (a) is respondent's *failure to provide information*.") (emphasis

in original).


By contrast, the use of adverse facts available is warranted where Commerce finds that a

respondent "has failed to cooperate by not acting to the best of its ability to comply with a

request for information . . . ." *See* 19 U.S.C. § 1677e(b)[5]; *see also Nippon Steel*, 337 F.3d at

---

[4](...continued)
> this subtitle,
>
> (B) fails to provide such information
> by the deadline for submission of the
> information or in the form and
> manner requested, subject to
> subsections (c)(1) and (e) of section
> 1677m of this title,
>
> (C) significantly impedes a proceeding under this
> subtitle, or
>
> (D) provides such information but the information
> cannot be verified as provided in section 1677m(i)
> of this title, the administering authority and the
> Commission shall, subject to section 1677m(d) of
> this title, use the facts otherwise available in
> reaching the applicable determination under this
> subtitle.

19 U.S.C. § 1677e(a).

[5]     This statute provides:

> If [Commerce] . . . finds that an interested party has failed to
> cooperate by not acting to the best of its ability to comply with a
> request for information from [Commerce] . . . , [Commerce], in
> reaching the applicable determination under this subtitle, may use
> an inference that is adverse to the interests of that party in selecting

(continued...)

1381 ("[S]ubsection (b) permits Commerce to 'use an inference that is adverse to the interests of

[a respondent] in selecting from among the facts otherwise available,' only if Commerce makes

the separate determination that the respondent 'has failed to cooperate by not acting to the best of

its ability to comply.'" (bracketing in original)).  The Court of Appeals for the Federal Circuit

stated that "[t]he focus of [1677e(b)] is respondent's *failure to cooperate to the best of its ability*,

not its failure to provide requested information." *Nippon Steel*, 337 F.3d at 1381 (emphasis in

original).  The Court of Appeals further stated that "the statutory mandate that a respondent act to

'the best of its ability' requires the respondent to do the maximum it is able to do." *Id.* at 1382.


A.    Commerce's Use of Facts Available/Adverse Facts Available in Assigning
      Separate Rates

The court in *Huarong I* first determined that Commerce's use of facts available and

adverse facts available was justified, with respect to the Companies' sales data and factors of

production, on the grounds that the integrity of the Companies' reported data was compromised

---

[5](...continued)
> from among the facts otherwise available.  Such adverse inference
> may include reliance on information derived from—
>
>> (1) the petition,
>>
>> (2) a final determination in the investigation under
>> this subtitle,
>>
>> (3) any previous review under section 1675 of this
>> title or determination under section 1675b of this
>> title,
>>
>> (4) any other information placed on the record.
>
> 19 U.S.C. § 1677e(b).

"due to the nature of [the Companies'] verification failures, and the inadequacy of [their]

cooperation."  The court also found that

> [t]his reasoning, however, cannot be the basis for assigning the
> Companies the PRC-wide antidumping duty margin based on facts
> available, as it is clear the Companies did provide evidence of their
> entitlement to separate rates and there is no indication that any
> necessary information was missing or incomplete.  In other words,
> the findings that justified the use of facts available and a resort to
> adverse facts available with respect to the Companies' sales data
> and factors of production, cannot be used to accord similar
> treatment to issues relating to the Companies' evidence of
> independence from state control.

*Huarong I*, slip op. 03-135 at 41–42.  With respect to Commerce's resort to adverse facts

available, the court stated:

> [T]he record shows that the Companies apparently kept records
> sufficient to satisfy Commerce of their independence from state
> control and supplied such records to Commerce in a timely
> fashion.  Because findings with respect to data Commerce found to
> be "compromised"—i.e., the Companies' sales data and Huarong's
> factors of production data—are distinct from those related to state
> control, it is difficult to see how Commerce's determination with
> respect to the sales and factors of production data can form the
> basis for the use of adverse facts available with respect to
> independence from state control.

*Huarong I*, slip op. 03-135 at 43–44.  Upon remand, the court instructed Commerce to "revisit its

determination that the Companies were to receive the P.R.C.-wide antidumping duty margin."

*Id*. at 45.  Pursuant to this directive, Commerce reconsidered its determination with respect to

separate rates in the Final Results of Redetermination Pursuant to Court Remand ("Remand

Results"), and found that "[s]ince the Department found no specific discrepancies with respect to

the separate rates information, we therefore determine that Huarong and LMC are entitled to

separate rates."  Remand Results at 2.  Because no party disputes this finding, the court affirms

Commerce's conclusion as to the Companies' entitlement to separate rates.


II.        Commerce's Use of Adverse Facts Available in Calculating Separate Rates

Where a party fails to cooperate by not acting to the best of its ability to comply with a

request for information from Commerce, 19 U.S.C. § 1677e(b) permits Commerce to

> use an inference that is adverse to the interests of that party in
> selecting from among the facts otherwise available.  Such adverse
> inference may include reliance on information derived from—
>
>> (1) the petition,
>>
>> (2) a final determination in the investigation under this
>> subtitle,
>>
>> (3) any previous review under section 1675 of this title or
>> determination under section 1675b of this title, or
>>
>> (4) any other information placed on the record.

*Id*.  In *Huarong I*, the court sustained Commerce's use of adverse facts available as to the

Companies' sales data, and Huarong's factors of production, since "the record show[ed] that

LMC and Huarong did not make the maximum effort to produce the sales records in order to

respond to Commerce's questionnaire requests.  Rather, the information contained in the

questionnaire responses was inaccurate." *See Huarong I*, slip op. 03-135 at 36.  Thus, although

the court found unjustified the use of adverse facts available with respect to the separate rates

determination, it found that the use of adverse facts available was justified in determining the

rates themselves.

In its resort to adverse facts available, however, Commerce had a wide range of sources to look to. For instance, in accordance with 19 U.S.C. § 1677e(b), Commerce could have applied the petition rate, the rate from the final determination in this investigation,[6] the rate from any previous determinations,[7] or any other information placed on the record.[8] Thus, Commerce could have chosen rates ranging from 0.00% to 47.88%. Commerce, however, chose to apply an adverse facts available rate of 139.31% as the appropriate antidumping duty rate for the Companies. This rate, the highest calculated antidumping duty rate from any prior segment of the proceeding, was calculated for another Chinese respondent, Tianjin Machinery Import & Export Corp. ("TMC"), which produced the same bars/wedges covered by the antidumping duty order at issue here. *See* Heavy Forged Hand Tools From the People's Republic of China: Notice of Final Court Decision and Am. Final Results of Antidumping Duty Admin. Revs., 68 Fed. Reg. 37,121, 37,122 (June 23, 2003).

The Companies maintain that the facts in the case do not warrant resort to the highest allowable prior margin, since they "did not act with an intent to deceive or misrepresent any

---

[6]     The rate in the final determination for this review was 47.88%, the highest prior rate for either of the Companies. *See* Final Results, 66 Fed. Reg. at 48,030.

[7]     In the seventh administrative review (1997–1998), for example, Huarong's rate was 1.27% and LMC's rate was 0.00%. *See* Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the P.R.C., 64 Fed. Reg. 43,659, 43,671 (ITA Aug. 11, 1999) (final results).

[8]     For example, the rate Commerce chose, 139.31%, was the rate for another PRC producer, Tianjin Machinery Import & Export Corp. ("TMC"), in the eighth administrative review. TMC's rate dropped to 0.56% in the following review (1999–2000), and was 0.25% in the most recent review (2000–2001). *See* Final Results, 66 Fed. Reg. at 48,029; *see also* Heavy Forged Hand Tools From the P.R.C., 67 Fed. Reg. 57,789, 57,792 (ITA Sept. 12, 2002).

facts. Rather, plaintiffs believed they answered Commerce's questions during the 9th Review correctly and otherwise cooperated." Pls.' Comments on Final Results of Redetermination Pursuant to Remand ("Pls.' Comments") at 3. As the substance of these arguments was considered and rejected in *Huarong I*, they will not be reconsidered here. The Companies further argue that Commerce's corroboration was deficient; and that the adverse facts available rate has no probative value and is aberrational. The court will address these arguments in turn.

     1.     *The need to corroborate the 139.31% rate*

The Companies argue that Commerce must corroborate the information it relied upon in choosing their margins. In deciding upon an antidumping duty margin for an uncooperative respondent, Commerce may rely on "secondary information," and must corroborate that information, to the extent practicable, from independent sources. *See* 19 U.S.C. § 1677e(c). Such secondary information may include, but is not limited to, "published prices lists, official import statistics and customs data, and information obtained from interested parties during the instant investigation or review." 19 C.F.R. § 351.308 (2004). Here, Commerce claims that, because it selected the Companies' rate based on an actual rate calculated for another P.R.C. company in the immediately preceding review, it did not rely on secondary information, and thus the corroboration requirement does not apply. *See* Remand Results at 4 ("[I]f the Department chooses, as total [adverse facts available], a calculated dumping margin from a prior segment of the proceeding, it is not necessary to question the reliability of the margin if it was calculated from verified sales and cost data."); *see also Acciai Speciali Terni S.p.A. v. United States*, 25 CIT 245, 265, 142 F. Supp. 2d 969, 990 (2001) ("Since we are relying on verified data for use as

adverse facts available for these unattributed sales, corroboration under 776(c) is not necessary.")

(citing Stainless Steel Sheet and Strip in Coils From Italy, 64 Fed. Reg. 30,750, 30,760 (ITA

June 8, 1999)).  Whether or not the rate calculated for a third party constitutes secondary

information need not be addressed, because the court is remanding questions relating to the

selection of the Companies' rate on other grounds.


Nevertheless, the court finds the rationale underlying the corroboration requirement, as

articulated by the Court of Appeals for the Federal Circuit, to be instructive in this case:

> It is clear from Congress's imposition of the corroboration
> requirement in 19 U.S.C. § 1677e(c) that *it intended for an adverse
> facts available rate to be a reasonably accurate estimate of the
> [plaintiff's] actual rate*, albeit with some built-in increase intended
> as a deterrent to non-compliance.  Congress could not have
> intended for Commerce's discretion to include the ability to select
> unreasonably high rates with no relationship to the respondent's
> actual dumping margin.  Obviously a higher adverse margin creates
> a strong deterrent, but Congress tempered deterrent value with the
> corroboration requirement.  It could only have done so to prevent
> the petition rate (or other adverse inference rate), when
> unreasonable, from prevailing and to block any temptation by
> Commerce to overreach reality in seeking to maximize deterrence.

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002)

(emphasis added).  Therefore, under the Federal Circuit's reasoning, Commerce must

nonetheless ensure that the rate chosen "[is] a reasonably accurate estimate of [each company's]

actual rate . . . ." *F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d

1027, 1032 (Fed. Cir. 2000).

2.      *The adverse facts available rate is aberrational and has no probative value*[9]

The Companies argue that "Commerce made no effort to select a realistic rate"; rather, "Commerce simply selected the highest possible rate." Pls.' Comments at 7. They maintain that the 139.31% rate is aberrational because it "is over 90 percentage points higher than any other rate for bars/wedges." *Id*. at 10 (emphasis in original). They further argue that the 139.31% rate is not probative of their likely actual antidumping duty margins, because there is no evidence to show that their margins would otherwise be so large. The Companies state:

> Commerce says that the probative value comes because there was another exporter during the prior review that received the 139.31 percent margin. But, Commerce fails to address the fact that both Huarong and LMC participated in the 8th Review. Their margins were 28.96 and 29.10 percent, respectively. Commerce fails to explain that while the margin for TMC dropped from the 8th Review to the 9th Review,[10] Huarong's and LMC's should increase by almost 5 times.

*Id*. at 13 (emphasis in original). They also maintain that "[s]ince the rate was based on a different factory, for different bars, by a different seller, with different input steel, and unverified data, the figure is not realistic." *Id*. at 8.

It is well-settled that in determining the antidumping duty margin for an uncooperative

---

[9]      The Companies further claim that the rate chosen by Commerce is punitive. As the court is remanding questions relating to the rate selected for other reasons, it need not address this claim. The magnitude of the increase alone, however, (from 47.88% in the final determination to the 139.31% rate at issue here) suggests that Commerce's selection of the 139.31% rate may have been punitive.

[10]      TMC's rate dropped from 139.31% in the eighth administrative review to 0.56% in the ninth administrative review, a decline of 138.75%. It is the ninth administrative review that is at issue here.

respondent, such as the Companies here, "Commerce is in the best position, based on its expert

knowledge of the market and the individual respondent, to select adverse facts that will create the

proper deterrent to noncooperation with its investigations and assure a reasonable margin." *De

Cecco*, 216 F.3d at 1032. Thus, Commerce has "broad, but not unbounded, discretion in

determining what would be an accurate and reasonable dumping margin where a respondent has

been found uncooperative." *China Steel Corp. v. United States*, 28 CIT __, __, 306 F. Supp. 2d

1291, 1311 (2004). In exercising its discretion, however, Commerce cannot select a rate based

solely on its interest in inducing foreign exporters to cooperate with Commerce's investigations.

"Rather, the rate must have *some relationship* to commercial practices in the particular

industry . . . . Commerce acts within its discretion so long as the rate chosen has a relationship to

the actual sales information available." *Ta Chen*, 298 F.3d at 1339–40 (emphasis added). To

that end, Commerce maintains that it

> examined the 139.31 percent rate and determined that it was
> relevant for use as an [adverse facts available] separate rate for
> plaintiffs because it was both "reasonable" and had "some basis in
> reality." . . . [T]his rate was the final separate rate "calculated for
> another PRC company, TMC, also in the immediately preceding
> review, and therefore reflects recent commercial activity by
> Chinese respondents that export bars/wedges to the United States.

Remand Results at 8. With respect to its contention that the 139.31% rate is relevant and has

"some basis in reality," Commerce states,

> Given that Huarong and LMC failed to cooperate in the underlying
> review, the Department concludes that the dumping margins that
> would have been calculated for the respondents in the review are
> likely higher than the dumping margins calculated for Huarong and
> LMC in the immediately preceding administrative review . . . .
> Without complete and verifiable information from the respondents,
> *it is not possible to definitively determine how much higher* [such
> calculated dumping margins likely would have been] . . . .

*Id*. at 4 (emphasis added).

   In order to satisfy substantial evidence, Commerce must go beyond simply stating that the 139.31% rate is "reasonable" and has "some basis in reality" because of the presumption arising from the failure to cooperate.  Commerce must also show how the rate "bear[s] a rational relationship to the *interested party* . . . ."  *See Reiner Brach GmbH & Co.KG v. United States*, 26 CIT __, __, 206 F. Supp. 2d 1323, 1339 (2002) (emphasis added); *see also China Steel Corp.*, 28 CIT at __, 306 F. Supp. 2d at 1339–40.  Here, the 139.31% rate was calculated in a preceding administrative review for another P.R.C. producer, TMC, and not for the Companies.  Thus, Commerce looked to the sales information for TMC in the eighth administrative review even though actual sales information for both Huarong and LMC was available for that same review. *See Manifattura Emmepi S.p.A. v. United States*, 16 CIT 619, 623–24, 799 F. Supp. 110, 115 (1992) (margin bearing no rational relationship to the respondent invalidated).   Indeed, the actual sales information from the Companies' eighth administrative review shows that their rates were significantly lower than TMC's—Huarong's rate was 28.96%, and LMC's was 29.10%. *See* Heavy Forged Hand Tools From the P.R.C., 65 Fed. Reg. 50,499, 50,500 (ITA Aug. 18, 2000) (am. final results).  Finally, even if the rate calculated for the Companies in the ninth administrative review may have been higher than the rate they received in the preceding review, Commerce has given no explanation as to why the rates would likely have increased so dramatically, i.e., by over 100 percentage points.   Considering that the rate chosen by Commerce would have resulted in the Companies' respective rates increasing more than five-fold from the eighth administrative review to the ninth, Commerce has failed to show how its chosen rate of

139.31% bears a rational relationship to the actual sales data for the Companies. Moreover, this increase appears to contravene the statutory requirement that Commerce "determine antidumping duty margins as accurately as possible." *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994); *see also D & L Supply Co. v. United States*, 113 F.3d 1220, 1223 (Fed. Cir. 1997) ("The statutory directive that Commerce use the best information available is intended to serve 'the basic purpose of the statute—determining current margins as accurately as possible.'") (internal citation omitted). For these reasons, the court agrees with the Companies that the rate selected by Commerce is aberrational and is not probative of what the Companies' actual rate would likely have been had they cooperated with Commerce's investigation, "with some built-in increase intended as a deterrent to non-compliance." *Ta Chen*, 298 F.3d at 1340; *see also Ta Chen Stainless Steel Pipe, Inc. v. United States*, 24 CIT 841, 847 (2000) (not reported in the Federal Supplement) (noting the court's concern that the chosen antidumping duty margin bear a rational relationship to the respondent's sales); *Reiner Brach*, 26 CIT at __, 206 F. Supp. 2d at 1339.

## CONCLUSION

Based on the foregoing, the court finds the 139.31% antidumping duty rate selected by Commerce to be both aberrational and lacking in probative value, and not supported by substantial evidence. On remand, Commerce shall revisit the evidence cited for its decision to apply the 139.31% rate and, shall it continue to employ such rate, provide adequate explanations for this decision based on the evidence. In particular, Commerce shall explain its reasons for not choosing a previous antidumping duty rate for the Companies themselves. Remand results are

due within ninety days of the date of this opinion, comments are due thirty days thereafter, and

replies to such comments eleven days from their filing.

/s/ Richard K. Eaton
Richard K. Eaton

Dated: September 13, 2004
      New York, New York